MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 9634
DUSTIN A. JOHNSON, ESQ.
Nevada Bar No. 9306
MUCKLEROY JOHNSON, LLC
6767 W. Tropicana Ave., Suite 106
Las Vegas, Nevada 89103
T: (702)248-1065
F: (702)938-4065
Email: martin@muckleroyjohnson.com
        dustin@muckleroyjohnson.com


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| LEE OLSON, Individually and On Behalf of All Others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | Case No._____ |
| | : | |
| v. | : | |
| | : | |
| ALAN BELL, DAVID J. HENNIGAR, DEREK H.L. BUNTAIN, MALEN S. NG, MELVIN A. RHINELANDER, CHARLES H. ROADMAN, II., MICHAEL J. SPECTOR, and ASSISTED LIVING CONCEPTS, INC. | : | **INDIVIDUAL CLAIMS FOR VIOLATION OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES AND EXCHANGE ACT OF 1934** |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Lee Olson ("Plaintiff"), by his attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     Plaintiff, a holder of common stock of Assisted Living Concepts, Inc., ("ALCI" or the "Company"), brings this action individually against the Company and the members of the

Board of Directors (the "Board"), for violations of sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      On February 26, 2013, Assisted Living Concepts, Inc., ("ALCI" or the "Company") and TPG Capital, L.P. ("TPG") jointly announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") pursuant to which TPG, through its wholly-owned subsidiaries Aid Holdings, LLC ("HoldCo") and Aid Merger Sub, LLC ("Merger Sub"), would acquire all the outstanding shares in a transaction valued at $278 million (the "Proposed Buyout").

3.      Specifically, the Merger Agreement provides that upon approval of a majority of ALCI's shareholders, Merger Sub will merge with and into ALCI, with ALCI continuing as the surviving corporation and a wholly-owned, indirect subsidiary of HoldCo (the "Merger"). At the effective time of the Merger, each share of Class A common stock outstanding will be converted into the right to receive $12.00 in cash per share, and each share of Class B common stock outstanding immediately prior to the effective time of the Merger will be converted into the right to receive $12.90 in cash, without interest and less any applicable withholding taxes.

4.      On March 11, 2013, ALCI filed a preliminary Proxy Statement on Schedule 14A ("Proxy Statement") with the SEC that failed to make all material disclosures and contained materially misleading statements about the Proposed Buyout. As explained below, the Proxy Statement exposes some details of the highly flawed sales process, but fails to disclose a myriad of material facts concerning the Proposed Buyout. The Proxy Statement omits and/or misrepresents material information concerning, among other things: (i) the sales process and the process by which the Board entered into the Proposed Buyout; (ii) the key data and inputs underlying the financial valuation exercises that purport to support the fairness opinion

("Fairness Opinion") provided to the Company's Board by Citigroup Global Markets, Inc. ("Citi"), the special committee's ("Special Committee") financial advisor; and (iii) certain financial projections prepared by ALCI's management and relied upon by Citi in issuing its Fairness Opinion regarding the Proposed Buyout.

5.    As a result of the materially deficient Proxy Statement, ALCI's public shareholders will be unable to cast an informed vote regarding the Proposed Buyout. By the ALCI Board omitting and misrepresenting material facts necessary to render the Proxy Statement non-misleading, ALCI and the Board violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.    For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Buyout until such time as Defendants provide all material information critical for a fairly and fully informed shareholder vote on the Proposed Buyout.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because one or more of the defendants, including ALCI either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, occurred in substantial part in this District. Finally, the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

9.     Plaintiff currently holds shares of common stock in ALCI and Plaintiff has held such shares since prior to the wrongs complained of herein.

10.     Defendant ALCI is a corporation organized and existing under the laws of Nevada, with its principal executive offices located at W140 N8981 Lilly Road, Menomonee Falls, Wisconsin 63051.   ALCI and its subsidiaries operate senior living residences throughout the United States.   ALCI's common shares are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ALC."

11.     Defendant Alan Bell ("Bell") is Vice Chairman of the ALCI Board and has been a member of the Board since 2006.  Defendant Bell also serves as a member of the Board's Audit and Compensation/Nomination/Governance Committees.

12.     Defendant David J. Hennigar ("Hennigar") is Chairman of the ALCI Board and has been a member of the Board since 2006.  Defendant Hennigar is Chair of the Company's Executive Committee.  Defendant Hennigar has served as Chairman and Chief Executive Officer of Thornridge Holdings Limited ("Thornridge"), an investment fund which controls 56% of the Company's stock and has entered into a voting agreement (the "Voting Agreement") to vote in favor of the Proposed Buyout.

13.     Defendant Derek H.L. Buntain ("Buntain") has been a director of the ALCI Board since   2006.   Defendant   Buntain   is   Chair   of   the   Company's Compensation/Nomination/Governance   Committee   and   is   a   member   of   the   Company's Executive and Audit Committee.

14.     Defendant Malen S. Ng ("Ng") has been a director of the ALCI Board since 2006. Defendant Ng is Chair of the Company's Audit Committee.

4

15.     Defendant Melvin A. Rhinelander ("Rhinelander") is Vice Chairman of the ALCI Board and has been a member of the Board since 2006.  Defendant Rhinelander is a member of the Company's Executive Committee.  Additionally, Defendant Rhinelander served as Chairman of the Company's special committee ("Special Committee"), which was formed for the purpose of exploring strategic transactions or alternatives for the Company.

16.     Defendant Charles H. Roadman, II ("Roadman") has served as the Company's President and Chief Executive Officer since May 29, 2012.

17.     Defendant Michael J. Spector ("Spector") has been a director of ALCI since 2007. Defendant Spector is a member of the Company's Executive Committee and Compensation/Nomination/Governance Committee.

18.     Defendants Bell, Hennigar, Buntain, Ng, Rhinelander, Roadman and Spector are collectively referred to hereinafter as the "Individual Defendants."

19.     Collectively, the Individual Defendants and ALCI are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.    Background**

The Company

20.     ALCI was formed as a Nevada corporation in 1994.  ALCI operated as an independent company until January 31, 2005 when it was acquired by Extendicare Health Services, Inc. ("EHSI") (the "Extendicare Acquisition"), a wholly-owned subsidiary of Extendicare Inc. ("Extendicare").  Following the Extendicare Acquisition, Extendicare consolidated its assisted living operations with ALCI's operations until their separation.

21.     ALCI became an independent, publicly traded company listed on the NYSE on November 10, 2006 (the "Separation Date") when shares of ALCI Class A and Class B Common Stock were distributed by Extendicare to its shareholders ("the Separation").

22.     As of December 31, 2012, the Company and its subsidiaries operate 211 senior living residences, containing 9,348 units that are dispersed throughout the United States.  ALCI's residences typically range from 40 to 60 units per facility.

<u>ACLI's Strong Financial Performance and Negative Publicity</u>

23.     In the past several years, ALCI has experienced strong economic growth.  On March 8, 2012, the Company reported its Annual financial results for 2011.  ALCI reported record annual and quarterly results.  Specifically, the Company posted a 34.8% and 50.0% increase in diluted earnings per share over the fourth quarter of 2010 and fiscal year 2010 and increased adjusted EBITDAR as a percentage of revenues to 38.6%, up from 35.7% for the four quarter of 2010.  The Company also announced that it was increasing its quarterly dividend to $0.10 per share.  However, recently, the Company's strong financial performance has been plagued by bad publicity and mismanagement of the Company's leases with Ventas Realty.

24.     On April 26, 2012, Ventas Realty, filed an action against ALCI alleging that the Company breached its obligation under the leases with Ventas Realty due to several ALCI entities facing state regulatory actions for violation of state regulatory statutes.  Ventas Realty is the landlord for eight assisted living facilities operated by ALCI.  Specifically, the action lists three facilities located in Georgia and Alabama that had received notices of license and permit revocation hearings for failing to be in compliance with state regulations.

25.     Subsequently, on May 3, 2012, the Company's Board announced that it would investigate possible irregularities in connection with the Company's leases with Ventas Realty.

Unfortunately for ALCI shareholders, the bad publicity from this action brought by Ventas Realty substantially impacted the auction process and led to many of the potential bidders substantially reducing their offering price to acquire the Company.

26.     On May 9, 2012, the Company filed a press release on Form 8-K with the SEC disclosing to shareholders that an action had been filed against the Company.  Specifically, the 8-K stated in relevant part:

> If Ventas is successful in pursuing its claims, Ventas could invoke the remedies available to it under the lease, which could include the acceleration of rent payments and the loss of the Company's ability to continue to operate the eight properties under the lease. Assuming the Company is able to realize tax benefits from the payments, at its current tax rate of 37.0%, the Company estimates, calculated as of March 31, 2012, that the accelerated rent payments would reduce future net income by approximately $10.2 million. This amount may be reduced in certain jurisdictions by future rent payments to Ventas from leasing the properties to others. In addition to the cash payment discussed above, if the Company were to lose the ability to operate these eight properties, it estimates, calculated as of March 31, 2012, that it would record certain non-cash charges to its future net income in the amount of $6.9 million assuming it is able to realize tax benefits from such charges at its current tax rate of 37.0%. These charges to net income consist of the write-off of $5.5 million of operating lease intangibles, $1.6 million of property and equipment remaining with the property and $0.3 million of other current assets, partially offset by $0.5 million of a deferred rent liability. The Company is not able to provide assurance that the tax benefits resulting from any such payments and write-offs would be realized. The eight properties under the Ventas lease had revenue and an operating loss of $3.2 million and $(0.4) million, respectively, for the first quarter of 2012 and $13.3 million and $(1.7) million, respectively, for the year ended December 31, 2011.
>
> ***
>
> In addition, under the terms of the Company's $125 million revolving credit facility with U.S. Bank National Association, as administrative agent, and certain other lenders, the Company's ability to borrow additional funds may be limited if the matters discussed above were deemed to be reasonably likely to have a material adverse effect on the Company or trigger a requirement for the Company to obtain a consent or waiver from U.S. Bank.

27.     To make matters worse for the Company, the Individual Defendants removed Bebo as President and Chief Executive Officer of the Company.  On May 29, 2012, the Company issued another press release filed on Form 8-K with the SEC announcing the removal

of Bebo and the appointment of Defendant Roadman as the Company's interim President and

Chief Executive Officer of the Company.  The 8-K stated, in relevant part, that:

> On May 29, 2012, ALC also announced that Charles H. Roadman, II, M.D., age 68, will serve as interim President and Chief Executive Officer during the Company's search for a permanent chief executive officer. Also on May 29, 2012, Dr. Roadman resigned as a member of the Audit Committee of the Board of Directors of the Company (the "Board") as a result of his new role. In recognition of Dr. Roadman's assumption of the Interim President and Chief Executive Officer roles and expanded responsibilities, in addition to his director compensation, he will receive: (i) a cash payment of $2,000 per work day; (ii) a car allowance to be determined; and (iii) use of a furnished apartment in Milwaukee.

***

> Dr. Roadman has served as a director of the Company since 2006. Dr. Roadman is a retired President and Chief Executive Officer of the American Health Care Association (1999 to 2004) and former Surgeon General of the U.S. Air Force (1996 to 1999). Prior to November 10, 2006, he was a director of Extendicare Inc. (now Extendicare Real Estate Investment Trust). Dr. Roadman serves as a director and advisor on a number of private corporate boards.

28.     On June 15, 2012, the Company issued a third press release filed on Form 8-K

with the SEC announcing that it had settled the Ventas Realty litigation.  The 8-K stated, in

relevant part, that:

> On June 15, 2012, Assisted Living Concepts, Inc. ("ALC") signed and closed on an agreement (the "Purchase Agreement") with Ventas Realty, Limited Partnership ("Ventas Realty") and MLD Delaware Trust ("MLD") to purchase 12 residences consisting of 696 units (the "Properties") for a purchase price of $97 million plus $3 million for a litigation settlement fee plus Ventas's expenses in connection with the litigation. The Properties, five located in Georgia, four in South Carolina and one in each of Florida, Alabama and Pennsylvania were previously operated by ALC under (i) the Amended and Restated Master lease Agreement, dated as of January 1, 2008, between Ventas and various ALC subsidiaries signatory thereto, and (ii) the Master Lease and Security Agreement, effective January 1, 2002, between MLD Delaware Trust and ALC (together the "Master Leases"). The transaction was funded with borrowings available under ALC's $125 million revolving credit agreement.

***

> As part of the Purchase Agreement, Ventas Realty and MLD have agreed to release all past, present and future claims with respect to the Master Leases, the

Properties and the Guaranty of Lease dated as of January 1, 2008 made by ALC for the benefit of Ventas Realty Limited Partnership as well as those set forth in the complaint and amended complaint filed in *Ventas Realty, Limited Partnership v. ALC CVMA, LLC, et al*., 12-cv-03107, in the United States District Court for the Northern District of Illinois. Additionally, pursuant to the Purchase Agreement, ALC is obligated to indemnify Ventas against losses from third party claims, arising on or prior to the six year anniversary of the Purchase Agreement, relating to the Master Leases or the Properties.

***

ALC will no longer be obligated under the Master Leases which provided for cash rent payments of $6.4 million and $1.6 million for the year ended December 31, 2011 and the quarter ended March 31, 2012, respectively. Interest on borrowings under ALC's Revolver is expected to be at a rate of LIBOR plus 3.00%. Assuming a consistent LIBOR rate, annual pre-tax cash savings in 2011 would have been approximately $3.2 million. ALC is still in the process of determining other accounting implications related to this transaction.

29.     On June 29, 2012, Bebo initiated an arbitration proceeding against the Company disputing the existence of cause for her termination and alleging that she is entitled to more than $2.4 million in severance pay and other termination benefits because her termination was without cause.  Additionally, Bebo initiated an action against the Company requesting that the Company produce certain company records previously requested by Bebo as a director of the Company and a judgment requiring the Company to indemnify Bebo for all expenses incurred in connection with the Company's internal investigation relating to the Ventas leases and to advance Bebo all expenses incurred by her in connection with the investigation.

30.     The fallout from Ventas Realty continued into the Fall of 2012.  On August 7, 2012, the Company issued a fourth press release filed on Form 8-K with the SEC.  The 8-K informed shareholders that the SEC was initiating an investigation relating to the Company.  The investigation centered on the Company's compliance with occupancy covenants in the former Ventas Realty leases and leasing of units for employee use.

**B.      The Proposed Buyout**

31.      In February 2011, the Company initiated a process to sell the Company.  The Board contacted Citi and asked Citi to identify parties, including strategic and financial acquirers that might be interested in a potential transaction with the Company pursuant to which the entire Company or its real estate assets would be sold.  Citi worked with the Board to identify U.S. Healthcare Real Estate Investment Trusts ("REITs") and other financial and strategic acquirers that were active in operating or investing in real estate.  At the time the Company initiated the process to sell the Company, ALCI's common stock was trading at $16.00 per Class A share.

32.      In July 2011, the Board instructed Citi to contact a group of six healthcare REITs about a potential acquisition for the Company.   Subsequently, the Company executed confidentiality agreements with the three parties: Party A, Party B and Party C.

33.      On October 3, 2011, Party C submitted a written indication expressing interest in a potential transaction and proposed a valuation range of $17.00 to $20.00 per share of Class A common stock.

34.      On November 3, 2011, the Board formed a Special Committee to consider a potential transaction and the Company's alternatives.  The Company appointed Defendants Rhinelander, Ng, Roadman and Spector as members of the Special Committee.

35.      On November 9, 2011, the Company's Special Committee held a meeting at which the Special Committee named Defendant Rhinelander as Chairman of the Special Committee.  Defendant Rhinelander would be required to provide day-to-day oversight over the process of exploring strategic alternatives for the Company.

36.      Between November 11, 2011 and January 23, 2012, ten potential buyers (forming seven bidding groups) executed confidentiality agreements with the Company (Party C, Party D/Party E, Party F, Party G/Party H, Party I, Party J and TPG/Party K).

37.     By January 23, 2012, the Company had received four written proposals indicating an interest in a potential transaction.  Party C offered $18.00 to $19.00 per share of Class A common stock in cash, Party D/Party E offered $19.00 per share of Class A common stock in cash, Party F offered $18.50 to $19.50 per share of Class A common stock in cash and Party G/Party H offered $21.00 per share of Class A common stock ($16.00 in cash and $5.00 in convertible preferred equity). Party I, Party J, Party K and TPG did not submit proposals to acquire the Company.

38.     On January 26, 2012, a meeting of the Special Committee was held.  Citi, the Special Committee's financial advisor, made a presentation to the Special Committee that included, among other things, an update on the process, profiles of the potential buyers and an analysis and comparison of the offers made by the potential buyers.  Citi also discussed with the members of the Special Committee strategic alternatives other than the sale of the Company.

39.     Party K (originally a bidding partner with TPG) subsequently contacted Citi and expressed interest in continuing in the process.  After discussion with Defendant Rhinelander, representatives of Citi suggested that Party K consider partnering with Party J (who had also expressed an interest in finding a bidding partner) to make a joint offer to acquire the Company. Instead, Party K asked for permission to partner with Party L.  Subsequently, Defendant Rhinelander approved the Party K/Party L partnership and invited Party K/Party L to participate in the process.

40.     Defendant Rhinelander advised Citi that he had instructed Sagent Advisors, LLC ("Sagent"), a boutique investment banking firm, to conduct an outreach to six additional financial sponsors in order to gauge their interest in a potential transaction.  Party M, Party N, Party O and Party P executed confidentiality agreements with the Company and received

confidential information about the Company, while Party Q and Party R did not sign confidentiality agreements. After reviewing the confidential information, Party M, Party N and Party O indicated interest in moving forward.  In response, Defendant Rhinelander directed Citi to request that such potential buyers submit a written indication of interest in a potential transaction.

41.     On March 6, 2012, Party K/Party L submitted a written proposal to acquire the Company for $20.00 to $21.00 per share of Class A common stock in cash.

42.     On March 7, 2012, the Company's Special Committee held a meeting.  The Special Committee discussed developments in the process, including Party K/Party L's offer of March 6, 2012.  The Special Committee then discussed Party C's interest in continuing to participate in the sale process with Party S as a bidding partner.  The Special Committee discussed its concerns with Party S's potential participation in the sale process, noting that Party S is a competitor of the Company.  After discussion, the Special Committee determined to allow Party C to partner with Party S, but to closely monitor Party S's participation in the process.

43.     On March 8, 2012, Party F informed Citi that it would not continue in the process.

44.     On March 12, 2012, Party O submitted a written proposal to acquire the Company for $20.00 per share of Class A common stock in cash.  After consultation with Defendant Rhinelander, Citi invited Party O to join the ongoing process.

45.     On March 16, 2012, Party J informed Citi that it wanted to rejoin the process.

46.     On March 19, 2012, the Company's Special Committee held another meeting by phone.  A representative of Citi provided an update on the process, stating that four bidders remained involved: Party C/Party S, Party G/Party H, Party K/Party L and Party O.  After holding discussions, the Special Committee instructed Citi to obtain final round bids from the

three bidders with outstanding offers equal to or greater than $20.00 per share of Class A common stock: Party G/Party H, Party K/Party L and Party O.

47.     On March 23, 2012, Citi sent letters to Party G/Party H, Party K/Party L and Party O, instructing the potential buyers to submit final round bids (including a mark-up of the Company's draft merger agreement) by April 18, 2012.

48.     Also on March 23, 2012, Party J submitted a written proposal to acquire the Company for $20.50 per share of Class A common stock in cash.

49.     On March 27, 2012, Party G/Party H informed Citi that it would not continue in the process.

50.     On March 30, 2012, a meeting of the Special Committee was held.  The Special Committee discussed the status of the process, noting that Party K/Party L and Party O remained as potential buyers.  The members of the Special Committee also discussed Party J's offer on March 23, 2012 and expressed concern that Party J would not be able to submit a final round offer by the April 18, 2012 deadline set for Party K/Party L and Party O and discussed the potential impact of extending the process to accommodate Party J.

51.     Between March 30, 2012 and April 18, 2012, Party T and Party U contacted Citi and expressed interest in a potential transaction.  ***Defendant Rhinelander determined that Party T and Party U would only be allowed to participate in the process at that time if their participation would not jeopardize the timeline for the process, including the receipt of final round offers from Party K/Party L and Party O.  Ultimately, Party J, Party T and Party U were not invited to join the process***.

52.     On April 10, 2012, the Company's Board held a meeting of the Board of Directors.  Defendant Rhinelander provided the Board with an update on the process, including that final round bids were expected on April 18, 2012.

53.     On April 18, 2012, Party K/Party L submitted a written proposal to acquire the Company for $19.00 to $20.00 per share of Class A common stock in cash, but was contingent upon resolution of an issue regarding facilities leased by the Company from Ventas Realty.

54.     Also on April 18, 2012, the members of the Special Committee held a meeting. The Special Committee discussed the developments in the sale process and the issues arising from the Ventas Realty leases.  The Special Committee further discussed how the Ventas Realty leasing issue would potentially affect the process and potential bidders' offers and their related valuations of the Company.  However, instead of delaying the process until the Ventas issue had been resolved, the Company continued with the auction process, even while the bidders began reducing their offers to acquire the Company.

55.     On April 19, 2012, Party O informed Citi that it would not continue in the process.

56.     On April 24, 2012, the members of the Company's Special Committee held a meeting.  Defendant Rhinelander provided the other members of the Special Committee with an update regarding conversations between the Company and Ventas.  A representative of Citi then made a presentation to the Special Committee that included, among other things, an analysis of Party K/Party L's offer on April 18, 2012.  After discussion of the Ventas issue and the Party K/Party L offer, the members of the Special Committee determined that, in light of the current status of the Ventas issue, they would not reach a definitive decision regarding the Party K/Party L offer at that time.

57.     On April 26, 2012, Ventas filed an action against the Company that sought a declaratory judgment that the Company had breached its obligations under the leases with Ventas and forfeited its right to possession of the facilities leased thereunder (the "Ventas Action").  On May 3, 2012, the Board announced that it would investigate possible irregularities in connection with the Company's leases with Ventas.

58.     Following the announcement of the Ventas Action by the Board, the Company's stock fell more than 12% and bidders for the Company began lowering the bids for the Company.  On May 21, 2012, Party K/Party L submitted a revised proposal to acquire the Company for $17.00 to $18.00 per share of Class A common stock in cash, a $2.00 per share reduction from its prior proposal.  ***Party K/Party L indicated that the reduction resulted from an assumption of higher costs associated with the resolution of the Ventas issue***.

59.     On June 15, 2012, the Company reached an agreement with Ventas to acquire 12 facilities leased from Ventas for $97,000,000.  As part of the agreement, the Company also agreed to pay Ventas a $3,000,000 litigation settlement fee and reimburse Ventas for the expenses incurred as a result of the litigation.

60.     In July 2012, representatives of Party K/Party L met with Defendant Rhinelander to reiterate Party K/Party L's continued interest in acquiring the Company.

61.     On August 2, 2012, the Company was informed by the SEC that its staff was conducting an investigation of the Company.  The investigation surrounded the Company's compliance with occupancy covenants in the former Ventas leases and leasing of units for employee use.

62.     On August 17, 2012, the Company's Board held a Board of Directors meeting. During the meeting, Defendant Rhinelander provided the Board with an update on the process, including that Party K/Party L had expressed continued interest in acquiring the Company.

63.     On August 21, 2012, Defendant Rhinelander instructed Citi to solicit a revised offer from Party K/Party L.

64.     After learning that the Company was the subject of an SEC investigation and other litigation, Party K/Party L submitted a revised written proposal to acquire the Company for $13.50 per share of Class A common stock in cash, ***a $4.50 per share reduction from its previously revised bid made on May 21, 2013***.  In addition, Party K/Party L indicated that its offer price would be reduced further by any liabilities related to the Company's SEC investigation and other litigation matters.  Rather than placing the auction process on hold until the litigation surrounding the Company had been resolved, the Individual Defendants pressed on with the auction process to the detriment to the Company's shareholders.

65.     On August 30, 2012, the members of the Special Committee held another meeting.  A representative of Citi discussed with the Special Committee Party K/Party L's offer of August 29, 2012.  Following discussion, the members of the Special Committee determined that they could not support Party K/Party L's offer of August 29, 2012 at that time.  The Special Committee then asked Citi to work with the Company's management to prepare an illustrative future stock price analysis of the Company on a stand-alone basis in order to compare such analysis with the Party K/Party L offer.

66.     On September 4, 2012, the members of the Special Committee held a meeting. Defendant Rhinelander informed the other members of the Special Committee that Party V, a pension fund, had expressed an interest in (a) acquiring the Company for $13.50 to $14.00 per

share of Class A common stock, based solely on publicly available information about the Company, or (b) providing financing to the Company. The Special Committee then reviewed, among other things, an illustrative future stock price analysis of the Company that Citi had prepared with the assistance of the Company's management. After discussion, the Special Committee determined to instruct Citi to communicate to Party K/Party L that a price of at least $15.00 per share was necessary in order to acquire the Company. After considering the impact of the Company's SEC investigation and other litigation matters on a potential transaction, the Special Committee determined to ask Defendant Bell to help support the negotiations with potential bidders due to his specialized knowledge of the SEC investigation and other litigation matters.

67.     Also on September 13, 2012, Citi presented Party K/Party L with a counterproposal pursuant to which Party K/Party L would acquire the Company for $15.25 per share of Class A common stock in cash, without reduction for liabilities related to the Company's SEC investigation and other litigation matters.

68.     On September 20, 2012, Party K/Party L submitted a revised written proposal to acquire the Company for $14.00 per share of Class A common stock in cash. However, Party K/Party L indicated that its offer price would be further reduced by any liabilities related to the Company's SEC investigation and other litigation matters.

69.     Between September 20, 2012 and September 28, 2012, Party J, Party O and Party W submitted acquisition proposals to acquire the Company. The Special Committee discussed the proposals and following discussions directed Citi to solicit new offers to acquire the Company from Party J, Party O and Party W.

70.     On September 28, 2012, the Company's Special Committee held another meeting. A representative of Citi reviewed the status of the negotiations with Party K/Party L, focusing on Party K/Party L's offer on September 20, 2012 and its concern about exposure to liabilities relating to the SEC investigation and other litigation matters.   The representative of Citi also informed the members of the Special Committee that Party O had given an oral offer of $12.00 to $15.00 per share of Class A common stock in cash, ***subject to due diligence on liabilities related to the Company's SEC investigation and other litigation matters***.   The representative of Citi also reported that Citi had revised its illustrative future stock price analysis of the Company (prepared with the assistance of the Company's management) in order to include potential liabilities related to the Company's SEC investigation and other litigation matters.   After discussion, the Special Committee instructed Citi to present Party K/Party L with two options: (a) limited exclusivity with Party K/Party L if Party K/Party L offered to acquire the Company for at least $14.00 per share of Class A common stock in cash (without reduction for liabilities related to the Company's SEC investigation and other litigation matters) or (b) no exclusivity with Party K/Party L.

71.     On October 2, 2012, Party W submitted an indication of interest, based on publicly available information, to acquire the Company for $15.00 per share of Class A common stock in cash, but that such offer was conditioned upon the outcome of the SEC investigation of the Company.

72.     On October 3, 2012, Party O submitted a written proposal to acquire the Company for $12.00 to $15.00 per share of Class A common stock in cash.

73.     On October 16, 2012, Party K/Party L submitted a revised written proposal to acquire the Company for $14.25 per share of Class A common stock in cash, without reduction

for liabilities related to the Company's SEC investigation and other litigation matters. Party K/Party L also requested exclusivity.

74.     Also on October 19, 2012, the Special Committee held a meeting.  At the meeting, members of the Special Committee reviewed Party K/Party L's offer of October 16, 2012 and considered the possibility of receiving revised bids from Party O and Party W.

75.     On October 29, 2012, following completion of further due diligence, Party K/Party L  revised its proposal to acquire the Company downward, offering $12.25 per share of Class A common stock in cash at closing and up to $2.00 per share of Class A common stock in contingent cash payments after closing.  This represented a $7.25 per share drop in the offer initially made by Party K/Party L on January 23, 2012.

76.     On November 2, 2012, in connection with the announcement of the Company's results for the third quarter of 2012, the Company publicly announced that (a) the Company would be commencing a process to dispose of seven New Jersey facilities owned by the Company and (b) that the Board was considering a divestiture of certain closed and underperforming facilities.  The Company also publicly announced that the Special Committee would continue its strategic review process to explore strategic alternatives.

77.     On November 9, 2012, following negotiations between Citi and Party K/Party L, Party K/Party L submitted a proposal to acquire the Company for $12.75 per share of Class A common stock, but that such proposal was subject to investment committee approval.

78.     On November 12, 2012, Party K/Party L informed Citi that Party K/Party L was withdrawing its offer of November 9, 2012 because such offer had failed to receive investment committee approval.

79.     Later on November 12, 2012, the members of the Company's Special Committee held a meeting. A representative of Citi made a presentation to the Special Committee that included, among other things, a valuation analysis of the Company (prepared with the assistance of the Company's management) and an analysis of Party K/Party L's offer using various valuation metrics.  After discussion, the Special Committee determined that it would continue to negotiate with Party K/Party L, even though the consideration being offered to the Company's shareholders was substantially below their initial offer of $19.50 per share.

80.     On November 14, 2012, the Special Committee instructed Citi to contact parties that had previously participated in the process, gauge their interest in rejoining the process and invite them to submit a written proposal for the acquisition of the Company by December 7, 2012.

81.     On November 15, 2012, TPG independently contacted Citi and expressed its desire to rejoin the process.

82.     During the week of December 3, 2012, Party O and TPG attended presentations by the Company's management.

83.     On December 7, 2012, TPG submitted a written proposal to acquire the Company for $11.00 to $13.00 per share of Class A common stock in cash.  Party F, Party J and Party O declined to submit proposals to acquire the Company.  However, Party F did express an interest in acquiring certain of the Company's assets rather than the Company in its entirety.  The Special Committee informed Party F that it was not interested in selling the assets in which Party F expressed an interest in acquiring.

84.     On December 8, 2012, Party K/Party L submitted a revised written proposal to acquire the Company for $11.25 per share of Class A common stock.

85.     Later on December 8, 2012, Defendant Rhinelander and representatives of Citi discussed TPG's offer of December 7, 2012 and Party K/Party L's offer of December 8, 2012. Following such discussion, Defendant Rhinelander instructed Citi to solicit final round offers (including definitive transaction documentation) from TPG and Party K/Party L by January 28, 2013.

86.     On January 16, 2013, the Company's Special Committee held a meeting.  The members of the Special Committee reviewed Foley's status as legal counsel to the Special Committee in light of the fact that Foley also was acting as legal counsel to U.S. Bank in U.S. Bank's capacity as administrative agent and collateral agent under the credit agreement.  The Special Committee determined to terminate Foley as legal counsel to the Special Committee. The Special Committee retained Cravath, Swaine & Moore LLP ("Cravath") to serve as its legal counsel to the Special Committee moving forward.

87.     On January 27, 2013, Party F contacted Citi and reiterated its interest in acquiring certain of the Company's assets rather than the Company in its entirety.  The Special Committee again refused to consider engaging in a sale of the Company's assets rather than a sale of the entire Company.

88.     On January 28, 2013, Party K/Party L submitted a revised written proposal to acquire the Company for $10.50 in cash for all outstanding shares of the Company's Class A common stock.  Also on January 28, 2013, TPG submitted a revised written proposal to acquire the Company.  Both Party K/Party L and TPG stated that they required exclusivity in order to move forward.

89.     On February 2, 2013, TPG verbally submitted an offer to acquire the Company for $11.75 per share of Class A common stock in cash.

90.     Later on February 2, 2013, the members of the Special Committee held a telephonic meeting.  The Special Committee discussed and reviewed the proposals submitted by Party K/Party L on January 28, 2013 and the TPG offer made on February 2, 2013.   After discussion, the Special Committee instructed Citi to inform Party K/Party L that Party K/Party L must raise its offer to at least $12.00 per share in cash with no debt financing contingency if it wished to have a leading offer. Citi promptly complied with the instructions.

91.     On February 5, 2013, Party K/Party L submitted an offer to acquire the Company for $11.50 per share of Class A common stock in cash and removed the debt financing contingency contained in its offer of January 28, 2013.

92.     On February 6, 2013, the Company's Special Committee held a final meeting to discuss the strategic process.  A representative of Citi reviewed with the Special Committee TPG's proposal made on February 2, 2013 and Party K/Party L's proposal made on February 5, 2013.  Later on February 6, 2013, representatives of TPG subsequently sent to Citi a draft exclusivity agreement, pursuant to which the Company and its affiliates and representatives were required to not solicit any proposals from, or engage in any discussions with, any third party with respect to a competing transaction until 11:59 p.m. P.T. on February 25, 2013.

93.     On February 7, 2013 the Company engaged in negotiations with TPG regarding an exclusivity agreement.  On February 8, 2013, the Company and TPG signed an exclusivity agreement with an exclusivity period that would be terminated on February 25, 2013.

94.     On February 9, 2013, the Board held a Board of Directors meeting to discuss the strategic process.  The Board reviewed the Special Committee process to date and a summary of the latest proposals from Party K/Party L and TPG.  The Special Committee also informed the

Board that it would be moving forward with TPG "as the leading bidder and signed an exclusivity agreement with TPG."

95.     Later on February 9, 2013, a telephonic meeting of the Special Committee was held, which was attended by all members of the Special Committee.  During the meeting, the Special Committee discussed Thornridge's request for the reimbursement of fees and expenses incurred as a result of the voting agreement being negotiated between it, the Company and TPG. Additionally, the Special Committee was apprised of a potential conflict of interest between Citi and TPG.  Specifically, that *"TPG and its affiliates collectively are one of the top fee payers to Citi."*

96.     On February 15, 2013, Defendant Rhinelander and Citi received an unsolicited written proposal from Party K/Party L to acquire the Company at a price of $12.00 per share of Class A common stock in cash, without a debt financing contingency.  However, the Special Committee decided that it would continue negotiations with TPG regarding a possible acquisition of the Company.

97.     On February 17, 2013, the Special Committee, through its financial advisor, Citi, engaged in further negotiations with TPG, through its financial advisor, Goldman Sachs & Co. ("Goldman Sachs").

98.     Between February 22, 2013 and February 25, 2013, the Company and TPG engaged in negotiations over the Merger Agreement.  In addition, the Company negotiated with Thornridge about the voting agreement.

99.     On February 24, 2013, a telephonic meeting of the Special Committee was held, which was attended by all members of the Special Committee.  Representatives of Cravath and Citi also were present.  A representative of Citi made a presentation to the Special Committee

that included, among other things, a summary of the key terms of the offer made by TPG and a valuation analysis of the Company. Following deliberations, the Special Committee unanimously voted that it would recommend to the Board approval of the Proposed Buyout.

100. On February 25, 2013, a telephonic meeting of the Board was held. Defendant Rhinelander, on behalf of the Special Committee, informed the Board that the Special Committee recommended that the Board approve the proposed potential transaction with affiliates of TPG. The Board, after discussions concerning the Proposed Buyout unanimously voted in favor of approving the Merger Agreement.

101. Also on February 25, 2013, a telephonic meeting of the Special Committee was held, in which the members of the Special Committee unanimously voted in favor of approval of the Merger Agreement.

102. On February 26, 2013, the Company and TPG issued a joint press release announcing its entry into the Merger Agreement.

**C. The Materially Misleading And/Or Incomplete Proxy Statement**

103. On March 11, 2013, ALCI filed the Proxy Statement with the SEC which provides some discussion of this history of the negotiations between ALCI and TPG. However, the Proxy Statement is woefully deficient, in that material information has not been provided to ALCI shareholders in order for them to decide whether to approve the Proposed Buyout.

***Disclosures Related to the Events Leading Up to the Announcement of the Proposed Buyout***

104. The Proxy Statement fails to disclose material information concerning the events leading up to the announcement of the Proposed Buyout, including:

105. The Proxy Statement, at page 23, states:

In July 2011, the Board instructed Citi to initiate an outreach on a confidential basis to a group of six healthcare REITs about a potential transaction. Subsequently, Citi requested that each of the six REITs execute confidentiality

agreements in order to facilitate the disclosure of confidential Company information. Three of the REITs contacted by Citi (Party A, Party B and Party C) executed confidentiality agreements with the Company.

106.    The Proxy Statement, however, fails to disclose the basis for the Board instructing

Citi to only reach out to six healthcare REITs who were solicited as potential acquirers in July

2011.

107.    The Proxy Statement, at page 25, states:

Mr. Rhinelander advised Citi that he had instructed Sagent Advisors, LLC, a boutique investment banking firm, to conduct an outreach to six additional financial sponsors in order to gauge their interest in a potential transaction.

108.    The Proxy Statement, however, fails to disclose the rationale for Defendant

Rhinelander engaging Sagent to conduct an outreach to six additional financial sponsors in order

to gauge their interest in a potential transaction.  In addition, the Proxy Statement fails to disclose

the criteria utilized by Defendant Rhinelander is selecting these six additional financial sponsors.

109.    The Proxy Statement, at page 27, states:

On May 29, 2012, the Board terminated Ms. Laurie Bebo's employment as the President and Chief Executive Officer of the Company for cause and appointed Dr. Roadman as Interim President and Chief Executive Officer of the Company. As a result, Dr. Roadman resigned from his position on the Special Committee and the Audit Committee of the Board.

110.    The Proxy Statement, however, fails to disclose what constituted the "cause" that

led the Board to terminate Bebo on May 29, 2012.

111.    The Proxy Statement, at page 27, states:

On August 17, 2012, a telephonic meeting of the Board was held, which was attended by all members of the Board. During the meeting, Mr. Rhinelander provided the Board with an update on the process, including that Party K/Party L had expressed continued interest in acquiring the Company.

112.    The Proxy Statement, however, fails to disclose whether Defendant Rhinelander

informed the Board that Party K/L was only prepared to move forward with a reduced bid and an

understanding that the bid may be further reduced by any liabilities related to the Company's SEC investigation and other litigation matters for the Company.

113.    The Proxy Statement, at page 28, states:

On September 4, 2012, a telephonic meeting of the Special Committee was held, which was attended by all members of the Special Committee. A representative of Foley also was present. Mr. Rhinelander informed the other members of the Special Committee that Party V, a pension fund, had expressed an interest in (a) acquiring the Company for $13.50 to $14.00 per share of Class A common stock, based solely on publicly available information about the Company, or (b) providing financing to the Company. The Special Committee then reviewed, among other things, an illustrative future stock price analysis of the Company that Citi had prepared with the assistance of the Company's management. After discussion, the Special Committee determined to instruct Citi to communicate to Party K/Party L that a price of at least $15.00 per share was necessary in order to acquire the Company.

114.    The Proxy Statement, however, fails to disclose the *Illustrative Future Stock Price Analysis* that the Board considered and that analyzed the potential liabilities including litigation costs to the Company.

115.    The Proxy Statement, at page 29, states:

On November 2, 2012, in connection with the announcement of the Company's results for the third quarter of 2012, the Company publicly announced that (a) the Company would be commencing a process to dispose of seven New Jersey facilities owned by the Company and (b) the Board is also considering a divestiture of certain closed and underperforming facilities. The Company also publicly announced that the Special Committee would continue its strategic review process to explore corporate alternatives with a view to enhancing shareholder value.

116.    The Proxy Statement fails to disclose whether the Board ever disposed of the seven New Jersey facilities owned by the Company.  Additionally, the Proxy Statement fails to disclose the rationale for not disposing of the seven New Jersey facilities in the event they were not sold.

117.    The Proxy Statement, at page 30, states:

26

On November 14, 2012, the Special Committee instructed Citi to contact parties that had previously participated in the process, gauge their interest in rejoining the process and invite them to submit a written proposal for the acquisition of the Company by December 7, 2012.

118.    The Proxy Statement, however, fails to disclose how many parties were contacted on November 14, 2012, whether such parties were strategic or financial bidders, and the criteria used by the Special Committee for selecting which parties to rejoin the process in connection with a possible acquisition of the Company.

119.    The Proxy Statement, at page 30, states:

On November 16, 2012, representatives of Citi contacted Party F, Party J, Party O and TPG and invited them to rejoin the process. Representatives of Citi offered each party access to an electronic data room and the opportunity to meet with the Company's management

120.    The Proxy Statement, however, fails to disclose whether other parties besides Party O and TPG were informed that if they rejoined the process they would have an opportunity to meet with the Company's management.

121.    The Proxy Statement, at page 30, states:

During the week of December 3, 2012, Party O and TPG attended presentations by the Company's management.

122.    The Proxy Statement, however, fails to disclose whether management of ALCI discussed possible retention of the Company's management in a deal concerning the Company.

123.    The Proxy Statement, at page 30, states:

On December 7, 2012, TPG submitted a written proposal to acquire the Company for $11.00 to $13.00 per share of Class A common stock in cash. Party F, Party J and Party O declined to submit proposals to acquire the Company. Party F did express an interest in acquiring certain of the Company's assets rather than the Company in its entirety, but, after consultation with Mr. Rhinelander and at his direction, Citi informed Party F the Special Committee's strategy at that time did not include selling the assets in which Party F expressed an interest in acquiring.

124.    The Proxy Statement, however, fails to disclose the rationale for the Special Committee not considering a sale of assets to increase shareholder value; rather than simply a sale of the entire Company.

125.    The Proxy Statement, at page 31, states:

January 16, 2013, a meeting of the Special Committee was held, which was attended by all members of the Special Committee. Mr. Bell also was present at the Special Committee's request. The members of the Special Committee reviewed Foley's status as legal counsel to the Special Committee in light of the fact that Foley also was acting as legal counsel to U.S. Bank in U.S. Bank's capacity as administrative agent and collateral agent under the credit agreement. Mr. Bell noted that representatives of Foley had confirmed that an ethical wall had been established at Foley in order to protect Foley and the Special Committee from conflicts. However, the members of the Special Committee agreed that it was fundamental to the successful fulfillment of the Special Committee's mandate that the independence of the Special Committee and its advisors and the evaluation of strategic alternatives be maintained in both fact and perception. As a result, the Special Committee determined to terminate Foley as legal counsel to the Special Committee. The Special Committee also determined to retain Cravath, Swaine & Moore LLP ("Cravath") as independent legal counsel to the Special Committee, after considering the qualifications, expertise and reputation of Cravath in mergers and acquisitions and special committee assignments, subject to Cravath's confirmation that Cravath has no conflict issues and would be independent for purposes of acting as legal counsel to the Special Committee. Cravath subsequently so confirmed and was retained by the Special Committee.

126.    The Proxy Statement, however, fails to disclose why the Special Committee waited almost a year into the process to replace its legal advisor, Foley with Craveth, even while it knew of the potential conflict of interest.

127.    The Proxy Statement, at page 33, states:

Later on February 9, 2013, a telephonic meeting of the Special Committee was held, which was attended by all members of the Special Committee. Representatives of Cravath and Citi also were present. A representative of Cravath informed the Special Committee that Thornridge had requested that the Company reimburse Thornridge for the reasonable and documented out-of-pocket expenses it incurs pursuant to the negotiation of the voting agreement or otherwise in connection with the proposed transaction with TPG. After discussion, the Special Committee determined to not reimburse Thornridge's expenses. In response to the Special Committee's request for disclosures and commitments related to potential conflicts of interest, the representatives of Citi

informed the Special Committee that (a) no representative of Citi acting in an advisory capacity to the Special Committee owns any equity or debt interests in, or has any other financial relationship with, the Company or TPG, (b) Citi will not provide debt financing to a potential bidder for the Company and (c) TPG and its affiliates collectively are one of the top fee payers to Citi. After Citi departed the meeting, the members of the Special Committee discussed the disclosures and commitments made by Citi, focusing on the fact that TPG pays substantial fees to Citi, but acknowledging that any large financial institution likely receives similar fees from TPG. After such discussion, the members of the Special Committee concluded that the relationship between Citi and TPG would not impact the ability of Citi to provide independent advice to the Special Committee, subject to continuing review should additional conflicting facts become known

128.    The Proxy, however, fails to disclose the rationale for the Board and/or the Special Committee engaging a second financial advisor to render an independent fairness opinion to the Board after the Special Committee learned that Citi had a substantial conflict of interest between itself and TPG.  Additionally, the Proxy Statement fails to disclose why Citi did not perform an independent evaluation of the Company's liabilities or performing appraisals of the Company's assets.

129.    Shareholders will be unable to make a fully-informed decision regarding the Proposed Buyout without this vital information.

***Citi's Fairness Opinion***

130.    In addition, the Proxy Statement also fails to disclose material information concerning the key data and inputs relied upon by Citi, the Special Committee's financial advisor, in rendering its Fairness Opinion, including:

    a.    In the *Undisturbed Trading Range Analysis*, performed by Citi, the Proxy Statement fails to disclose the rationale for choosing the stock's trading price on August 8, 2012 and November 1, 2012 for the comparison with the per share merger consideration;

    b.    In the *Key Comparable Companies Analysis*, performed by Citi, the Proxy Statement fails to disclose: (i) the following multiples for each of the public company's selected by Citi in its analysis: (1) enterprise value/calendar year 2012 estimated ("CY2012E") EBITDA; (2) enterprise value/calendar year 2013 estimated ("CY2013E") EBITDA; (3) price/CY2012E EPS; and (4)

price/CY2013E EPS; (ii) the individual ranges of equity value per share derived by Citi for each selected multiple ranges; (iii) the criteria used to select EBITDA and EPS reference ranges applied to ALCI to calculate an implied per share equity value range; (iv) the ranges of individual per share equity values observed for each of the 2012 and 2013 EBITDA and EPS multiples; and (v) resolve the inconsistent treatment of comparable companies in ALCI's Definitive Proxy filed on March 23, 2012, when the Compensation Committee used five comparable companies to benchmark executive compensation, (*i.e.* Brookdale Senior Living, Inc., Capital Senior Living Corporation, Emeritus Corporation, Five Star Quality Care, Inc., Sunrise Senior Living , Inc., and Marcus Corporation) yet in the Proxy Statement disclosed to shareholders concerning the Proposed Buyout, Citi cited Five Star Quality Care, Inc., as the only directly comparable company.

c.    In the *Premium Paid Analysis*, performed by Citi, the Proxy Statement fails to disclose: (i) the selected transactions observed for this analysis; (ii) the premiums observed for each of the selected transactions observed in the *Premium Paid Analysis*; and (iii) the low, median, mean and high premiums observed for the selected transactions;

d.    In the *Selected Transaction Analysis*, performed by Citi, the Proxy Statement fails to disclose: (i) the following multiples for the precedent transaction selected by Citi in its analysis: (1) transaction value/EBITDA for last 12 months ("LTM EBITDA"); and (2) transaction value/EBITDA for next 12 months ("NTM EBITDA"); (ii) the individual range of equity value per share derived by Citi for each selected multiple range; (iii) the transaction value/LTM EBITDA and transaction value to NTM EBITDA multiples observed for the selected transaction; and (iv) the ranges of individual per share equity values observed for each of the LTM EBITDA and NTM EBITDA metrics;

e.    In the *Discounted Cash Flow Analysis*, performed by Citi, the Proxy Statement fails to disclose: (i) the assumptions used to derive normalized fiscal years 2013, 2014, 2015, and 2016 estimated EBITDA; (ii) whether there was an adjustment for stock based compensation; (iii) the key inputs in calculating the cost of capital; (iv) the criteria used to select perpetuity growth rates of 2.0% to 3.0%; (v) the terminal values used for the Company in the *Discounted Cash Flow Analysis*; and (vi) the criteria used to select the discount range of 10.1% to 11.8%; and

f.    In the *Illustrative Sum-of-the-Parts Analysis*, performed by Citi, the Proxy Statement fails to disclose: (i) whether the liabilities arising from the litigation against the Company was taken into account in arriving at the valuation of the Company; (ii) the criteria used to select a valuation multiple of 10.3x used in the *Selected Transaction Analysis*; and (iii) the rationale for Citi applying a cap rate range between 7.0%-8.0%.

***Certain Prospective Financial Information***

131.    The Proxy fails to disclose a complete definition for EBITDA.  Additionally, the Proxy must disclose each of the components that make up the unleveraged free cash flows. Further, the Company must disclose the *major* assumptions used to complete the financial projections, including the basis for revenue growth of 2.0% to 3.0% and changes of EBITA as a percentage of revenue.

132.    The above *information* is highly material as it is essential to allow shareholders to be able to make a fully informed decision concerning the Proposed Buyout.

133.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## **FIRST CAUSE OF ACTION**

**On Behalf of Plaintiff for Violations of Sections
14(a) of the Exchange Act
(Against the Company and the Individual Defendants)**

134.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

135.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

136.    Defendants have issued the Proxy Statement with the intention of soliciting shareholder support of the Proposed Buyout.

137.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement, which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

138.     Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

139.     The misrepresentation and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of her entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Buyout.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

**SECOND CAUSE OF ACTION**

**On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

140.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

141.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

142.     The Individual Defendants acted as controlling persons of ALCI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of ALCI, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

143.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

144.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Buyout.  They were, thus, directly involved in the making of this document.

145.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Buyout.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

146.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

147.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

148.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary injunctive and permanent relief including injunctive relief in his favor and against the Defendants as follows:

A.      \Preliminarily and permanently enjoining the Individual Defendants from taking any steps to consummate the Proposed Buyout until the Individual Defendants disclose all material information concerning the Proposed Buyout;

B.      Awarding Plaintiff the costs, expenses, and disbursements of this action including attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

C.      Awarding Plaintiff such other relief as this Court deems just, equitable, and proper.

Dated: April 3, 2013                    Respectfully submitted,

**MUCKLEROY JOHNSON**

By: _/s/ Dustin A. Johnson_
        Dustin A. Johnson, Esq.
6767 W. Tropicana Avenue, Suite 106
Las Vegas, Nevada 89103
Telephone: (702) 248-1065
Facsimile: (702) 938-4065

*Attorneys for Plaintiff*

*Of Counsel*:

**FARUQI & FARUQI, LLP**

Juan E. Monteverde
David M. Sborz
369 Lexington Ave., Tenth Floor
New York, NY  10017
Tel: (212) 983-9330
Fax: (212) 983-9331

**FARUQI & FARUQI, LLP**
Jacob A. Goldberg
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770
Fax: (215) 277-5771

*Attorneys for Plaintiff*